# United States District Court

## EASTERN DISTRICT OF CALIFORNIA

**FILED**

AUG 16 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

Case No.

## In the Matter of the Search of:

Google, Inc. at 1600 Amphitheatre Parkway, Mountain View, Ca 94043, of John (Johnny) Gerald Poland, and variations of such; related to username "dcwbys22", to include dcwbys22@gmail.com; and Google Voice/Talk accounts connected to telephone number 530 208-3022., and Microsoft at 1065 LaAvenida, Mountain View, Ca 94043, related to John (Johnny) Gerald Poland, and variations of such; and username "dcwbys22", to include  dcwbys22@hotmail.com; all as more particularly described in "Attachment A", attached hereto and fully incorporated herein

**2:12 - SW - - 4 4 9      GGH**

I, _____SA Christopher Campion_____, being duly sworn depose and say that I am a _____FBI Special Agent_____ and I have reason to believe that ___ on the person of and _X_ on the premises/property known as *(name, description and/or location)*

Google, Inc. at 1600 Amphitheatre Parkway, Mountain View, Ca 94043, of John (Johnny) Gerald Poland, and variations of such; related to username "dcwbys22", to include dcwbys22@gmail.com; and Google Voice/Talk accounts connected to telephone number 530 208-3022., and Microsoft at 1065 LaAvenida, Mountain View, Ca 94043, related to John (Johnny) Gerald Poland, and variations of such; and username "dcwbys22", to include  dcwbys22@hotmail.com; all as more particularly described in "Attachment A", attached hereto and fully incorporated herein

in the ___NORTHERN___ District of ___CALIFORNIA___ and elsewhere there is now concealed a certain person or property, namely *(describe the person or property)*

See Attachment B, attached hereto and incorporated herein,

which are fruits, evidence and instrumentalities *(give alleged grounds for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)* in violation of Title ___18___ United States Code, Section(s) ___242, 245, 1512, AND 2232___ .

The facts to support the issuance of a Search Warrant are as follows:

See attached Affidavit, attached hereto and incorporated herein

Continued on the attached sheet and made a part hereof.      _X_ Yes ___ No

_____
CHRISTOPHER CAMPION, SA FBI     (Signature of Affiant)

Sworn to before me, and subscribed in my presence

___Aug 16, 2012___
Date

at ___Sacramento, CA___
City and State

HON. GREGORY G. HOLLOWS, U.S. MAGISTRATE JUDGE
_____
(Name and Title of Judicial Officer)

**GREGORY G. HOLLOWS**
_____
(Signature of Judicial Officer)

## ATTACHMENT A

### Locations to be searched

I.  From 6/29/2011 to date of service of this warrant, all accounts at Google, Inc. at 1600 Amphitheatre Parkway, Mountain View, Ca 94043, of John (Johnny) Gerald Poland, and variations of such; related to username "dcwbys22", to include dcwbys22@gmail.com; and Google Voice/Talk accounts connected to telephone number 530 208-3022.

II.  From 6/29/2011 to date of service of this warrant, all accounts at Microsoft at 1065 LaAvenida, Mountain View, Ca 94043, related to John (Johnny) Gerald Poland, and variations of such; and username "dcwbys22", to include  "dcwbys22@hotmail.com".

III.  The Following Means Are To Be Used in Executing The Search:

A.  The officer executing this warrant may affect service by any lawful method, including faxing the warrant with the consent of the above entity;

B.  The custodian of the electronic records described above is to locate the files as described in Attachment B, copy them onto removable electronic storage media and also print them out as paper copies, and deliver both the electronic and paper copies to the officer.  The officer need not be physically on the premises.

## DESCRIPTION OF ITEMS TO BE SEIZED

You are to provide the following information as printouts and as electronic data files, to the extent available:

1. All stored communications or files, including: electronic mail of any kind sent to, from and through any email address identified below, whether opened or unopened and retrieved and unretrieved communications; Short Message Service (SMS) "texts", Multimedia Messaging Service (MMS), voice mail, and any other files in electronic storage, left with the provider and other stored files, for the below listed accounts:

   From 6/29/2011 to date of service of this warrant, all accounts at Google, Inc. at 1600 Amphitheatre Parkway, Mountain View, Ca 94043, of John (Johnny) Gerald Poland, and variations of such; related to username "dcwbys22", to include dcwbys22@gmail.com; and Google Voice/Talk accounts connected to telephone number 530 208-3022.

   From 6/29/2011 to date of service of this warrant, all accounts at Microsoft at 1065 LaAvenida, Mountain View, Ca 94043, related to John (Johnny) Gerald Poland, and variations of such; and username "dcwbys22", to include "dcwbys22@hotmail.com".

   This shall include any "back-up" copies of such data, including all archived records related to or associated with the above referenced names, user names, emails and telephone number accounts.

2. Basic subscriber, session and billing information, to include user connection date and time logs, such as local and long distance telephone connection records, and records of sessions times and durations, including the Internet Protocol (IP) address of the source of the connection, connection information for the other computer to which the user of the above referenced accounts connected, by any means, during the connection period, including IP address, connection date and time, disconnect date and times, method of connection to the destination computer, and all other information related to the connection assigned to the customer or subscriber for each session;

3. Outbound and inbound Call Detail Records;

4. Length of service (including start date) and types of service utilized;

5. Telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address;

6. Means and source of payment for such service (including any credit card or bank account numbers).

For a period of 60 days, the ISP is directed not to close the account or contact or attempt to contact the account holder regarding this warrant or that law enforcement has seized any information relevant to this account or any account holder which may be affiliated with this account and account holder.

AFFIDAVIT

1.     I, Christopher Campion, am a Special Agent with the Federal Bureau of Investigation (FBI) and I have been so employed since 1989.  As such, I am an investigative or law enforcement officer of the United States.  I am currently assigned to the South Lake Tahoe Resident Agency, where I conduct a variety of investigations in the areas of violent crime, white collar crime, national security and other federal offenses.  As part of my duties I investigate cases involving the corruption of state and local public officials.

2.     I have personally been involved in numerous investigations within the Eastern District of California wherein I served or assisted in serving search warrants, seizing evidence items to include computer equipment, and assisted the United States Attorney's Office in the successful prosecution of several individuals.

3.     I am currently conducting a criminal investigation of South Lake Tahoe Police Department (SLTPD) Officer John (aka Johnny) Gerald Poland, for violations of federal criminal law, including:   Title 18, United States Code, Sections 242 (Deprivation of Civil Rights Under Color of Law);  245 (Interference with Federally Protected Activities); 1512 (Witness Tampering), and 2232 (Notice of Search Warrant).

4.     The statements in this affidavit are based (a) on my personal knowledge, (b) on my participation in this investigation, (c) on my training and experience and on the training and experience of other law enforcement personnel with whom I have discussed this case, (d) on information gained from other law enforcement personnel, state and federal reports, and data bases, and (e) on statements of witnesses, victims, and law enforcement personnel.  The statements herein are set forth to establish probable cause that evidence, fruits, and instrumentalities pertaining to violation of the aforementioned federal criminal statutes, as described in Attachment B (attached hereto and incorporated herein), will be found at Google, Inc. and MSNHotmail, as further identified in Attachment A (attached hereto and incorporated herein) .

5.     Since this affidavit is based on information provided to me by other law enforcement officers, my own investigation of this matter, and from my knowledge, training, and experience, and is being submitted for the limited purpose of securing a search and seizure warrant to seize evidence of a crime, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish a foundation for the requested search warrant.

6.     Specifically, this affidavit is made in support of the issuance of a search warrant to search (1) all "Google" accounts registered to John (aka Johnny) G. Poland, (2) all "Google" accounts bearing the username "dcwbys22"  (and variations of such username), (3) all "Google" accounts linked to the telephone number "(530) 208-3022", and (4) all MSN Hotmail accounts registered to John (aka Johnny) G. Poland to include "dcwbys22@hotmail.com",  all as more particularly described in Attachment A, fully incorporated herein, for the evidence, fruits, and instrumentalities of the above referenced violations, as more particularly described in Attachment B, fully incorporated herein.

7.    In March 2010, law enforcement was conducting surveillance in the South Lake Tahoe area in a gang drug trafficking investigation. Specifically, law enforcement was conducting surveillance of the girlfriend (C1) of Teofilo Garcia Uribe, a validated gang member and drug trafficker. Law enforcement observed the girlfriend, C1, and Uribe together earlier on the same date with Sylvia Liendo (a known drug trafficker and girlfriend of Alex Hurtado, aka "Mousy", who is also a validated gang member). Hurtado was, during this time frame, also being investigated for a plot to murder a SLTPD gang investigator. While doing this surveillance, agents observed Poland, off duty, associating with C1 in a manner that indicated they were familiar. Poland was observed entering, with C1, the South Lake Tahoe residence of C1's daughter (who resided there with a known felon). In 2009, law enforcement had observed Poland, again off duty, in close association with gang members at a funeral.

8.    On June 29, 2010, SLTPD officers served a search warrant for an armed kidnapping suspect named Chris Wadstein. Wadstein was at that time a close associate of C1 and Liendo. Although Wadstein was not located at the initial search location, law enforcement shortly thereafter observed Wadstein arrive and then quickly depart Liendo's residence. A high speed chase ensued. Wadstein was apprehended after crashing his car and attempting to evade officers on foot. Poland, on duty, was assigned to transport Wadstein to jail. Wadstein (having known Poland as a School Resource Officer when he (Wadstein) attended South Tahoe High School) asked Poland to vouch for his character, to help get rid of "something" for him, and or to make a call to get someone else to get rid of the item. Poland declined and reported the conversation. Law enforcement determined that Poland served as the South Tahoe High School "School Resource Officer" from approximately 2003 through 2006.

9.    In July 2010, law enforcement received uncorroborated information that Poland (while the South Tahoe School Resource Officer) made sexual advances on minor female high school students, failed to arrest high school students for illicit drug possession on school grounds, had a sexual relationship with C1 (a methamphetamine user), disclosed law enforcement informant identities, and identified law enforcement (SLTPD) residence locations. This information was volunteered by 2 criminal defendants facing felony charges and seeking to obtain leniency by cooperating with law enforcement. One of the defendants further stated that Poland provided advance information to C1 so that she will not be caught in illegal activity. Your affiant has relied on this information for lead value, but does not offer the information as probable cause for issuance of the requested search warrant.

10.    Also in July 2010, law enforcement interviewed Uribe, a felon, while he was in custody for a probation violation. Uribe confirmed that his girlfriend, C1, was sexually involved with Poland for two years. He claimed, however, that she is now with Uribe solely. Uribe stated that Poland and C1 were on a common cell phone 'family' plan. Uribe has seen text messages written from Poland to C1, including one on Valentine's Day, 2010, wherein Poland tried to get C1 to meet him in Reno. Uribe stated that Poland planned the trip by lying to his own wife that he had to work. Uribe claimed Poland is associated with Eden, who he also knew as "Tiny." Poland tried to enlist "Tiny" to help set up Uribe by letting Poland know when Uribe possessed illegal drugs. "Tiny" instead alerted Uribe. (Subsequent investigation identified "Tiny" as Eden Solorzano, a validated gang member.) Uribe stated that Poland failed to report to SLTPD that Uribe's then high school aged cousin, the subject of an assault investigation, possessed a "real" firearm on school grounds in 2005. Uribe provided this information voluntarily and without promise of sentencing consideration.

Affidavit                                                                                                           2

11.     In September 2010, El Dorado County Jail supervisors reported that in September 2010 Poland met, in the county jail, with C1's son and Uribe, both validated gang members, while they were inmates. Jail video tapes corroborated that Poland was at the jail while C1's son was brought out of his cell pod for a visit on September 13, 2010. Poland failed to report this contact as part of his official duties.

12.     On September 24, 2010, law enforcement was called to Poland's residence by Poland's wife for domestic violence. She reported that her husband had been having an affair (later determined to be with C1). Poland's wife discovered Poland in the residence garage talking on a secret cell phone. Poland's wife was arrested for striking Poland during the incident. Months earlier, law enforcement learned that Poland's teenaged daughter found a digital memory card in the family residence. Poland's daughter accessed the card and found multiple explicit photographs of her father, Poland, engaged in sexual activity with an unknown female (later identified as C1).

13.     On December 9, 2010, while SLTPD was searching for Hurtado (then a parolee at large), law enforcement received information indicating Hurtado was being transported by C1. During SLTPD briefing (attended by Poland), C1's name, vehicle description, and personalized license plate were announced. Poland failed to report knowing C1, her residence location, or his familiarity with her vehicle to other officers. After the briefing, a SLTPD supervisor observed Poland depart the briefing, go to his patrol car, and make a cell phone call. In a subsequent voluntary interview with C1, C1 recalled that (while Hurtado was being sought) Poland called her from his patrol car. Poland advised her that he had just learned during a briefing that Hurtado was being linked to her vehicle. Poland told her to "get rid of her car".

14.     In May 2011, law enforcement executed a state search warrant at a gang member's residence in South Lake Tahoe. After finding a firearm, along with gang indicia, law enforcement uncovered evidence that the firearm was obtained from Uribe. The firearm was determined to be registered to the residence of C1's daughter (at which surveillance officers in 2010 observed C1 and Poland). On June 23, 2011, federal search warrants were issued for the South Lake Tahoe residence of C1 (utilized by Uribe) and the South Lake Tahoe residence of Uribe's mother (also utilized by Uribe). On June 29, 2011, law enforcement planned simultaneous execution of the warrants. During a briefing, Poland was present as a patrol officer assigned to perimeter security for the warrants' execution. During briefing, when photographs and the warrants were circulated, Poland appeared shocked. During the briefing, Poland was observed using his personal "smart" cell phone (with apparent text and internet access capability). Poland initially did not offer any information about C1 or his familiarity with the search location. After another officer (Martinez) was observed whispering to Poland, the officer, Martinez, then offered some intelligence about the interior of C1's residence. Poland then added some information regarding a dog and the possibility of a minor being present at C1's residence. After the briefing, Martinez and Poland advised an SLTPD supervisor that Poland should not be assigned to the perimeter detail. The supervisor warned Poland not to "do anything stupid" to alert anyone to the warrants. The warrants were served later that evening. Four ounces of suspected methamphetamine (NIK tested positive) were located at Uribe's mother's residence. No contraband was located at C1's residence. The suspected methamphetamine was later determined not to be a controlled substance by lab test.

15. On June 29, 2011, after the briefing and prior to the federal warrants' execution, Poland was alone on routine patrol in South Lake Tahoe. The SLTPD patrol vehicle that Poland used was, by SLTPD consent, outfitted with audio and video recording devices that captured sounds and images inside the patrol car. Poland made telephone calls on his personal cell phone prior to execution of the federal search warrants. In particular, there was one recorded call in which Poland is heard giving detailed notice (location information, target information, agency involvement, and suspected violation information) of the pending execution of the warrants. In the recorded call, Poland admitted that -- during the briefing -- he withheld and failed to reveal to the agencies conducting the searches and federal investigators his sexual relationship with C1, his familiarity with C1's criminal activity and associates, and his familiarity with C1's residence (one of the search locations). Poland provided this advance notice to a person familiar with C1. In another call before the warrants' execution, Poland attempted to contact "Tiny", believed to be Eden Solorzano, a known associate of Uribe (the target of the federal warrants). While the searches were on-going, Poland provided sensitive law enforcement information regarding the federal searches to several other individuals, including to C1 via telephone at her work while her residence was being searched. For example, Poland advised C1 that Uribe is the target of the federal investigation, not C1 or her family members. Poland explained that he could not alert her (C1) in advance because "[t]he FBI's involved so I can't fucking say anything, I don't know what they might tap." Poland advised C1 that Uribe was in custody and was being questioned and that the search had located a significant amount of methamphetamine at Uribe's mother's house.

16. On June 29, 2011, Poland -- in anticipation of federal agents interviewing C1 -- instructed C1 on how to respond. For example, Poland (immediately prior to law enforcement contact with C1 at her place of employment) told C1 repeatedly "Well just make sure you hold your shit together" and "If you're contacted when you get off just make sure you're fucking polite and don't be getting short or going off or anything else. If there's anything fucking bad on your phone, go ahead and delete it. They could very well take it." Poland coached her by saying: "Tell them the truth. Unfortunately it looks like my boyfriend got tied up into some shit. I'm not sure of the details. I'm in the dark on it." Poland later acknowledged in the recording that, in fact, both he and she knew Uribe had been "dealing [drugs] all along". Poland warned C1 that law enforcement may have Uribe's phone. Poland advised that law enforcement is interested in phone records, may record phone calls, listen to voice mail, and review text and messages.

17. On June 29, 2011, Poland via phone revealed sensitive law enforcement information to another female, "Niña" (who law enforcement later identified as Cynthia C, then age 23). Poland has an on-going sexual relationship with "Nina". Poland met "Niña" while she was a high school student and he was the School Resource Officer. During the recording, among other things, Poland revealed to "Niña" the federal nature of the investigation, including that it involved FBI SWAT personnel. In this recording, Poland also admitted that he withheld information (during the briefing) from law enforcement about his involvement with C1.

18. On June 29, 2011, during a voluntary interview with federal law enforcement, C1 was asked to identify everyone she had discussed the search of her residence with that day. C1 did not disclose talking to Poland. C1 admitted deleting messages from her phone that day, including messages from the subject of the search warrants (Uribe), a friend (Liendo), and her children. She claimed (as Poland had coached) that she did not know Uribe was involved in drug trafficking or that he currently used drugs. During a subsequent voluntary interview (on October 18, 2011), C1 stated that, in anticipation of her June 29, 2011 interview, she deleted text messages from her phone pursuant to Poland's instructions. On October 18, 2011, C1 stated that, sometime after the June 29, 2011 interview, Poland told her that the FBI had interviewed him the next day (June 30, 2011) and the FBI might be coming back to interview her.

19.     On June 30, 2011, Poland provided a voluntary interview to law enforcement. Poland admitted having a romantic relationship with C1 but lied about its length and when it terminated. Poland knew C1 was involved with Uribe, suspecting they were both seeing her at the same time. Poland knew Uribe was a parolee, drug dealer, and gang member. Poland offered to ask his friend "Tiny" (who he purported to be a reformed gang member) about Uribe possessing firearms. Poland knew C1's son was a gang member and was on parole for robbery. Poland claimed C1's son was a "good kid" who got involved with bad people. Poland admitted visiting C1's son in jail while on duty to check on him "because he's her (C1's) son." Poland admitted that C1 attempted to contact him the previous day (after learning of the search of her residence through her manager). He ignored her contacts until after the warrants had been executed. He admitted talking to her several times by phone at her employment. Poland stated that he makes calls on his "smart" phone both directly and through the "Google Talk" application. Poland claimed that by using "Google Talk" his call records do not show individual call details. Poland refused to provide his Google account user name.

20.     Also on October 18, 2011, C1 stated that Poland gave her sensitive law enforcement information on other occasions. C1 stated that Poland often told her to stay away from particular people, at times telling her "Just listen to me. I know what I'm talking about." C1 stated that Poland gave her advance information about Wadstein being wanted and for her to avoid him. C1 stated that Poland gave her advance information about "Mousy" (Hurtado) and advised her to avoid him and to get rid of her car. C1 denied giving "Mousy" rides and told Poland she might go to the police station to tell them she was not doing so. Poland responded "Are you that stupid? So they can ask you who told you this?"

21.     During the October 18, 2011 interview, C1 stated that she asked Poland to "run" people at various times during their relationship. C1 stated Poland provided vehicle registration information to her and her associates. C1 also stated that, at her request, Poland ran a check on whether a known local drug trafficker had an active warrant. C1 made the request on behalf of her associate, Liendo. Poland agreed to run the check, and later informed her that she (C1) should stay away from the drug trafficker (subject of the search) because she was wanted by the police. Also, Poland checked whether C1 had an active traffic warrant. Law enforcement data base record checks confirm Poland ran and or caused to be run all 3 protected non-public law enforcement computer record checks. C1 reported Poland often visited her at her residence while he was on duty and she recalled two incidents when she and Poland had sex while he was on duty.

22.     On October 18, 2011, C1 stated that Poland told her that he had engaged sexual activity with a 17 year old South Tahoe High School student (Victim 2).[1] Poland stated that the sexual relationship with Victim 2 occurred while he served as the School Resource Officer. C1 herself was not involved with Poland when he was in the sexual relationship with Victim 2. However, C1 was then acquainted with Poland and Victim 2. C1 stated that during the relevant period she had observed both Poland's personal car and his police car at Victim 2's house several

_____

[1] In a subsequent interview, C1 recalled another minor female (Victim 1) with whom Poland admitted having sexual activity. C1 believed Victim 1 is now a 25-26 year old South Lake Tahoe resident who had recently relocated back to the Tahoe area from Southern California. Poland told C1 that he had sex with Victim 1 at the time she was babysitting his children. As with Victim 2, Poland's sexually relationship with Victim 1 occurred prior to C1's relationship (starting 2007) with Poland.

times. Poland told C1 that he went to Victim 2's house drunk, and she (Victim 2) called Poland's wife, who then called police. C1 later recalled Poland stating he was very close to "going all the way" with the minor female, but stopped due to her age. C1 later learned that Poland gave Victim 2 gifts including a cell phone, CDs, and money.

23.     On October 18, 2011, C1 stated that Poland similarly seduced her (C1) with similar gifts. C1 provided personal items corroborating her relationship with Poland including CDs, photographs of the two of them, videos of Poland (including a video of him masturbating), hotel receipts and keys, romantic greeting cards, tickets and programs of events they attended, and gifts such as perfume, chocolates, a ring and a necklace. She also turned over an actual SLTPD badge assigned to Poland and Poland's military "dog" tags, both of which Poland had given to her. C1 provided these items for evidence after service of a grand jury subpoena. Between service of the subpoena and C1's compliance with the production of the items, Poland -- in a consensually recorded conversation -- advised her (C1) to conceal or destroy the items. In an effort to persuade her, Poland suggested to her (C1) that it would be logical for someone who had ended a relationship to get rid of items such as those covered in the subpoena. C1 told him (Poland) in the recorded conversation that she still had many mementos of their relationship. Poland indicated to her that she can not provide objects that she does not possess. C1 understood this to mean Poland was instructing her to destroy items covered by the subpoena.

24.     On October 19, 2011, Poland called C1 at work. Poland told her he had researched grand jury subpoenas and explained to her that she had to show up as directed, but she is entitled to legal representation, although the attorney would not be in the room with her. Poland, in an effort to persuade her, added that she should be careful with what she said because it could be used against her, and that she did not have to talk to anyone. Poland pressured her by saying that he was scared because "the minute you testify, they'll come to arrest me." Poland said there would probably be an internal affairs investigation too. Poland, in a further effort to persuade her to destroy evidence compelled for production by the subpoena, advised her again that the subpoena was "asking for anything that has to do with me and shit if you don't have it, you just don't have it."

25.     On October 21, 2011, C1 received a telephone call from Poland. The call was recorded. Poland told her (C1) that she may be asked for her phone records, which she could deny having. Poland stated that the FBI would go back to 2007 (when he started seeing C1) to uncover "shady shit." Poland said the FBI might try to tie him to Uribe's gun and that she should be honest that he had nothing to do with that. Poland, again attempted to persuade her to destroy subpoenaed items by stating that she can't give up what she does not have. On October 24, 2011, Poland sent a text message to C1 urging her to just tell the truth, that they are after him and not her, and if they talk or meet, they (the FBI) will "imply I'm coaching or coercing you."

26.     On October 31, 2011, Poland met with C1. In a recorded conversation, Poland stated that the FBI thinks he was "ratting, giving everyone the heads up about everything." C1 said the FBI was asking questions about Liendo, "Mousy" (Hurtado), and Wadstein, as well as items called for by the subpoena. Poland advised her that it was a common law enforcement tactic. C1 said that she still had all the items listed in the subpoena. Poland again responded that "you can't take what you don't have." He went on to tell her that he got rid of everything relating to her, except for three emails and pictures. When asked about the instances when he tipped C1 off about law enforcement interest in her friends and associates, Poland coached her that the proper response would be that "He (Poland) tried to do anything to keep me (C1) out of harm's way. To keep away from certain people." He said she should be honest.

Poland claimed he did not recall providing sensitive law enforcement information to C1 for Liendo, but observed that it all goes down to being "a snitch and a rat, protecting these people." When C1 reminded Poland that he had "run names" for her and that the FBI may be able to show that through records, he (Poland) responded that they (the FBI) did not know anything. Poland coached C1 regarding her terminology, stating "Be very careful.. Did I run somebody or check on a case?" Poland then framed the federal investigation, saying "that's what they [the FBI] are after, tie me into all this, I'm an informant for you", and then he attempted to influence her testimony by adding "I gotta worry about my life in your hands. A lot hinges on what you say." C1 believed that Poland was attempting to influence her grand jury testimony and that he was urging her to destroy evidence compelled by her grand jury subpoena.

27. On November 3, 2011, Poland conversed with C1 via telephone. The conversation was recorded. Poland stated that he had attempted to find Wadstein to talk with him about the investigation and to determine whether Wadstein was cooperating with law enforcement. Poland demanded that C1 conceal objects from the federal grand jury stating, among other things, "don't be fucking giving them my badge and my dog tags." Poland further demanded that she "better give that shit to me before you go giving those to them." Poland instructed her on how to ensure deletion of electronic data on a computer or smart phone. Poland stated that he researched, including on Google, how permanently to delete data. Poland explained that even after you delete the "stuff" (pictures, emails, texts, voicemails), you have to go the "garbage" and delete it again. Poland stated that he could only delete 10 items at a time. Poland stated that he "got rid of all of them" and added that he only kept 3 emails from C1. Poland also further coached C1 on what he wanted her to say to the federal grand jury. Poland told her to tell the grand jury that law enforcement is "out to get Johnny [referring to himself]" and that the investigation is "bull shit". Poland admitted that he knew his relationship with C1 and her associates was going to harm him.

28. On November 16, 2011, C1 advised law enforcement that on approximately November 12, 2011, Poland had talked to C1's son-in-law. Poland told him that C1 was scheduled to testify about him (Poland) and that her testimony could be very detrimental to him. On November 14, 2011, Poland told C1's daughter that he could no longer talk with her. On November 21, 2011, Poland (as visually depicted in work place video) told C1's son to tell his mother to make the right choice. C1 stated that Poland made these contacts to pressure her, influence her testimony, and discourage her cooperation with this investigation. C1 stated that she communicated with Poland in 2011 via his Goggle Talk application through telephone number (530) 208-3022. C1 also stated that she communicated with Poland in 2011 via his email address "dcwbys22@hotmail.com".

29. On November 29, 2011, federal law enforcement contacted Victim 1. After this initial contact (wherein she denied a sexual relationship with Poland), Victim 1 contacted Poland. According to Victim 1 (in late December 2011 interview), Poland at first admonished her that she didn't have to talk to the FBI. Poland later instructed Victim 1 "not to say anything." Two days later, after being served with a grand jury subpoena to testify, Poland told her to tell the truth in grand jury, but he repeated that she did not have to talk to the FBI. Poland warned her she may be asked about their sexual relationship while she was in high school. After discussing the timing of their sexual history, Poland stated they had nothing to hide. Poland told Victim 1 that the federal investigation had to do with C1, whom Victim 1 had heard of but had never met. Poland referred to C1 as "Psycho" and attempted to persuade Victim1 to tell the Grand Jury that C1 was crazy. Poland told Victim 1 that C1 could negatively impact his family life and job. Poland asked Victim 1 to bring a letter to the Grand Jury that he would prepare. Poland suggested she get an attorney to represent her.

30.     On December 15, 2011, law enforcement conducted a voluntary recorded interview with Victim 1 in connection with her appearance before a federal grand jury. After several prior denials to law enforcement, Victim 1 disclosed that she engaged in sexual activity with Poland in October 2003 while she was a 17 year old senior in high school. Poland was at the time a 35 year old School Resource Officer at South Tahoe High School. Victim 1 went to Poland's office at the high school for advice after a personal tragedy. Poland had previously assisted her when her property was vandalized at the high school. At the beginning of her senior year, she and Poland became close and met several times at out of the way locations where they would kiss and fondle each other. Victim 1 stated that on at least one occasion while she was 17 years old, Poland digitally penetrated her vagina. Poland asked her several times to perform oral sex on him, but she declined. Their meetings took place in secluded spots Poland suggested. Their meetings occurred both while he was on duty and off, including occasions when he took her home from babysitting his children. She and Poland also engaged in sexual activity at Poland's house while his wife was at work. Poland took her through Nevada to the North Shore of Lake Tahoe and to Sacramento. Victim 1 stated she did not have sexual intercourse with Poland until after her 18th birthday and her graduation from high school. In the late summer and early fall of 2004, Victim 1 and Poland met for sexual intercourse on two or three occasions at a motel in South Lake Tahoe. During her senior year in high school, Poland gave her several gifts, including music CDs and Dallas Cowboys shorts and halter top, which he had shipped to the high school so that his wife would not know about them. Poland acknowledged his sexual relationship with Victim 1 by signing Victim 1's high school yearbook with a hand written entry including  "I will always hope the best for you and will always be here for anything you might need IE ... A shoulder to cry on, a Hug, Kiss... (Take Forgranted [sic] Terre [Poland's wife] isn't around). I do appreciate your individual time that you give me and look forward to the days (and nights) ahead!"... "You are a special person to me [Victim 1's first name]! I love you (Shhh!) [heart symbol] JP  P.S. I don't think you suck in bed!"

31.     On December 20, 2011, Victim 1 spoke with Poland in a consensually recorded telephone conversation. He expressed hesitation about talking to her because it would look bad. Poland attempted to persuade her to tell law enforcement that the police were out to get him. Poland stated that SLTPD was retaliating against him. Poland stated that C1 was a "crazy bitch." During the conversation, Victim 1 informed Poland that she had appeared before the grand jury and that law enforcement seemed to know everything about their relationship, including their meetings at a particular motel in South Lake Tahoe. Poland told her to tell the truth saying that she had not done anything wrong. Instead of acknowledging his sexual activity began when Victim 1 was 17 years old and in high school, Poland attempted to influence her by characterizing his illicit sexual contact with her as merely an affair: "Oh well, so you and I had an affair, fucking lock me up." When Victim 1 told Poland she received a subpoena to produce emails and whatever gifts Poland had given her, Poland attempted to persuade her to destroy evidence by repeatedly telling her "You can't take what you don't have." He also told her to be honest because she's not in trouble.

32.     From the onset of their relationship in 2003 through January 2012, Victim1 contacted Poland using her cellular telephone to call his cellular telephone. She also contacted Poland via email and text message from her computer and phone to his computer and phone. Victim 1 stated that she communicated with Poland in 2011 and 2012 via the internet and his telephone number (530) 307-0955.

33.    On February 2, 2012, Victim 2 was interviewed.  She disclosed for the first time that she had engaged in sexual activity with Poland while she was a high school student and he was the School Resource Officer.  They met her freshman year and became closer during her junior year when she returned to Tahoe after having moved away.  Poland regularly gave her rides to and from school in his police patrol car.  He would also get her, and her friends, out of trouble at school.  He provided her and her friends with alcohol.  Poland gave her a cell phone for Christmas her senior year.  Poland regularly visited the house Victim 2 shared with her younger sister during Victim 2's senior year.  At the time, Victim 2 and her sister lived alone.  Victim 2's father was then on probation and her mother was wanted on criminal charges.  Victim 2's parents did not financially support their daughters requiring them to support themselves.  Victim 2 reported that Poland initially kissed and fondled her on several occasions.  Poland's sexual conduct then progressed to digitally penetrating her vagina on several occasions.  On one of the occasions in which Poland digitally penetrated her vagina, Victim 2 specifically recalled Poland was visiting her house while on duty and in uniform.  Their escalating sexual activity was interrupted when Poland received a work call and had to leave.  Victim 2 stated that all of her sexual activity with Poland occurred when she was 17 years old.

34.    In January 2006, as documented in police reports, Poland unexpected arrived at Victim 2's house.  At the time, Poland was off duty and intoxicated.  Victim 2 specifically remembered this incident.  Victim 2 was 17 years old.  She recalled that Poland came to her house intoxicated and at times staggered and walked into a door frame.  Victim 2 stated that Poland tried to get her to a back bedroom because he wanted to engage in sexual activity.  Poland put his arm around her and tried to direct her into a back bedroom.  When she refused and told him to leave the house, Poland refused to leave.  In an attempt to force him to leave, Victim 2 called Poland's wife and then the police department.  After Poland realized that Victim 2 had contacted his wife, Poland retaliated.  Poland threatened to contact the probation officer of Victim 2's father.  Poland threatened to contact Victim 2's boyfriend.  Poland also threatened to turn Victim 2's mother, who Poland knew was wanted, in to law enforcement.  This incident, and the subsequent police internal affairs investigation, ended their sexual relationship.  Poland maintained contact with Victim 2, including signing off on subsequent 'fix-it' tickets that she had not complied with.  She also stated that he conducted law enforcement computer checks for her.  Victim 2 stated that she communicated with Poland in 2011 via his Goggle Talk application through telephone number (530) 208-3022 and through telephone number (530) 318-9098.

35.    From April through June 2012, law enforcement identified additional former South Tahoe High School students as being unusually close to Poland while he was the School Resource Officer and they were high school students.  Two of the women described Poland taking a special interest in them.  Each stated Poland gave them nicknames, gifts, and other special attention.  Based on my training and experience, I am aware that pedophiles often seduce or "groom" minor victims with such techniques.  Both former students, separately, acknowledged that Poland appeared to be interested in having a sexual relationship with them.  Both denied that any sexual activity occurred.  Each of the former students separately reported that Poland told her that he had a sexual relationship with another high school girl.  One of the former students said that Poland confessed to her that he had sex with Victim 1 when she was in high school.  The other former student said Poland, in confessing his prior sexual relationship with a high school girl, did not identify with whom he was having sex.  She, however, was aware that he was closely involved with Victim 2 when she and Victim 2 were in high school.  Based on my training and experience, I am aware that pedophiles often further seduce or "groom" minor victims with such admissions to validate his desired sexual activity and encourage a sexual relationship.

Affidavit                                                                                                                        9

36.     The term "computer" as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

37.     I am aware that Google (through gmail.com amd googlemail.com) and Microsoft Network (through MSN Hotmail.com) are companies that are responsible for providing a web-based service whereby an individual can access e-mail located in an email account hosted by the company. The individual provides information requested by the company and an e-mail account is established. These individuals are called Subscribers. Account subscribers can store files, including e mails and image files, on servers maintained and/or owned by the company. Further, I am aware that Google (through certain applications including "Google Voice" and "Google Talk") provides services for communication via the internet. Specifically, Google Voice is an Internet telephony service from Google that enables PC-to-PC voice calls and video-enabled calls as well as PC-to-phone calls. Google Voice also enhances the capabilities of an existing phone line by providing features such as online voicemail, the capability to send and receive free text messages, options for delivering transcribed voice messages as text messages or as email messages, and the use of a single phone number that can be forwarded to any other number. Google Voice features can be used on mobile devices, including smartphones such as iPhone, Blackberry and Android. Google Talk is Google's chat and instant messaging application available on smartphones and computerized devices, including Android, Apple, Linux, Windows, Blackberry, and Google operating systems and mobile platforms. Google Talk also provides support for Voice over Internet Protocol (VoIP) or PC-to-PC calls. Google Talk, through Google's Gmail platform, facilitates Gmail storage for Google Talk chats and messages. Google Talk facilitates live messaging, voice mail, and offline messaging. Google Talk includes Voice over Internet Protocol (VoIP) capabilities, such as audio conferencing and file transfer. Users of Google Voice and Google Talk can store digital information, including files, emails, text messages, voice messages, and image files, on servers maintained and/or owned by Google. I am also aware that the servers, that are maintained and/or owned by each company respectively, are referred to below as "host server(s)" or "server(s)."

38.     Based on my training, experience, and knowledge, I know the following.

a.      The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities. In order to access the Internet, an individual computer user must subscribe to an access provider, which operates a host computer system with direct access to the Internet. The world wide web ("www") is a functionality of the Internet which allows users of the Internet to share information.

b.      With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world. This connection can be made by any number of means, including modem, local area network, wireless and numerous other methods. Email, text messaging, instant messaging, voice of internet protocol (VoIP) are all popular forms of transmitting messages and/or files in an electronic environment between computer users.

Affidavit                                                                                                10

c.   Subscribers to Google and Microsoft may access their accounts from a computer connected to the Internet by using a password. When an individual computer user sends e-mail or other communications, it is initiated at the user's computer, transmitted to the subscriber's mail server, and then transmitted to its final destination. A server is a computer that is attached to a dedicated network and serves many users. A server may allow users to post and read messages and to communicate via electronic means.

d.   Host computer systems often maintain subscriber data both on their primary servers and on back up servers for long periods of time. Even if a subscriber deletes data from their individual home computer or mobile device, the data may be recoverable on host computer servers.

39.   E-mails, data files, and other information stored on a host server by a subscriber may not necessarily be located in the subscriber's home computer or mobile device. The subscriber may store emails and/or other files on the host server for which there is insufficient storage space in the subscriber's computer and/or which he/she does not wish to maintain in the computer in his/her residence. A search of the files in the personal computer or mobile device in the subscriber's possession will not necessarily uncover files that the subscriber has stored on host servers.

40.   Title 18, United States Code, Chapter 121, Sections 2701 through 2711, is entitled, "Stored Wire and Electronic Communications and Transactional Records Access." Section 2703(a) provides, in part:

A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant. A governmental entity may require the disclosure by a provider of electronic communications services of the contents of a wire or electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

41.   The government may also obtain records and other information pertaining to a subscriber to, or customer of, electronic communication service or remote computing service by way of a search warrant. 18 U.S.C. § 2703(c)(1)(A). No notice to the subscriber or customer is required. 18 U.S.C. § 2703(c)(3).

42.   On or about August 1, 2012, your affiant caused to be searched through Neustar Inc., a company charged by the U.S. with the responsibility of the Number Portability Administration Center. According to Neustar Inc., 530 208-3022 is under the control of Bandwith/Google Voice. On or about August 1, 2012, your affiant caused to be sent preservation request letters via facsimile to Microsoft for "dcwbys22@hotmail.com" and to Google for dcwbys22@gmail.com , and Google Voice telephone number 530 208-3022 for stored electronic communications and subscriber information for stored electronic communications, including stored files, subscriber information and IP address logs for the identified accounts. Accordingly, there is likely still evidence, fruits, and instrumentalities of crime located in the accounts.

Affidavit                                                                                           11

43.     As set forth more particularly in Attachment B, the following items to be seized constitute evidence, fruits, and instrumentalities of:  multiple violations between June 29, 2011 and the present of 18 USC 1512(b)(2) (corruptly persuading a person to withhold records, objects, and testimony from an official proceeding);  multiple violations between June 29, 2011 and the present of 18 USC 1512(c)(2) (corruptly obstructing an official proceeding); multiple violations between September 2003 and the present of 18 USC 242 (Deprivation of Civil Rights Under Color of Law); multiple violations between September 2003 and the present of 18 USC 245 (Interference with Federally Protected Activities);  and, on or about June 29, 2011, of violating 18 USC 2232 (Unlawful Notice of Search Warrant).

(1)     All stored electronic communications, including all opened and unopened e-mail and text messages and attachments thereto, instant message chat communications, image files, sound files, video files, contact information, sent to or from, or stored in, the account(s) identified, below, whether opened or unopened, retrieved or un-retrieved, that are in electronic storage and left with (a) the provider Google, Inc. 1600 Amphitheatre Parkway, Mountain View, Ca 94043, related to accounts of John Poland,  dcwbys22@gmail.com , and Google Voice telephone number 530 208-3022, and with (b) the provider Microsoft 1065 LaAvenida, Mountain View, Ca 94043 related to accounts of John Poland and "dcwbys22@hotmail.com". This should include any "back-up" copies.

(2)     For the accounts identified above, basic subscriber, session and billing information, to include user connection logs, such as local and long distance telephone connection records, and records of sessions times and durations, including the Internet Protocol (IP) address assigned to the customer or subscriber for each session;

(3)     For the accounts identified above, length of service (including start date) and types of service utilized;

(4)     For the accounts identified above, telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address;

(5)     For the accounts identified above, means and source of payment for such service (including any credit card or bank account numbers).

44.     For a period of 60 days, the ISP is requested not to close the account or contact or attempt to contact the account holder regarding this request or that law enforcement has requested any information relevant to this account or any account holder which may be affiliated with this account and account holder.

45.     The officer executing this warrant requests permission to affect service by any lawful method, including faxing the warrant with the consent of the above entities.

46.     The officer executing this warrant requests permission to permit the above entities, as custodian of the electronic data described above, to locate the files, copy them onto removable electronic storage media and print them out as paper copies, and deliver both the electronic and paper copies to the officer.  In other words, the officer need not be physically on the premises listed in Attachment A during this process.

47.     Once the materials are seized and provided to law enforcement, the officer executing this warrant will search the seized items for evidence, fruits, and instrumentalities of the referenced violations.  The officer executing the warrant will search the contents of the seized items for such evidence.  Such evidence includes John (aka Johnny) G. Poland's and others motive, opportunity, preparation, plan, knowledge, absence of mistake, and/or accident.

48.     Based on the above information, there is probable cause to believe that John (aka Johnny) G. Poland has, between June 29, 2011 and the present, violated 18 USC 1512(b)(2) by corruptly persuading a person to withhold records, objects, and testimony from an official proceeding; between June 29, 2011 and the present, violated 18 USC 1512(c)(2) by corruptly obstructing an official proceeding; between September 2003 and the present, violated 18 USC 242 by depriving minors of Civil Rights Under Color of Law; between September 2003 and the present, violated 18 USC 245 by interfering with minors' federally protected activities; and, on or about June 29, 2011, violated 18 USC 2232 by giving unlawful notice of federal search warrant.

49.     Based upon the foregoing, I respectfully request that this Court issue a search warrant for (1) all "Google" accounts registered to John (aka Johnny) G. Poland, (2) all "Google" accounts bearing the username "dcwbys22" (and variations of such username), (3) all "Google" accounts linked to the telephone number "(530) 208-3022", and (4) all MSN Hotmail accounts registered to John (aka Johnny) G. Poland to include "dcwbys22@hotmail.com",  all as more particularly described in Attachment A, fully incorporated herein, for the evidence, fruits, and instrumentalities of the above referenced violations, as more particularly described in Attachment B, fully incorporated herein.

50.     I swear, under penalty of perjury, that the foregoing information is true and correct, to the best of my knowledge, information and belief.

CHRISTOPHER CAMPION
Special Agent, Federal Bureau of Investigation

Sworn and subscribed before me
this _16th_ day of August, 2012

**GREGORY G. HOLLOWS**

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE
Eastern District of California

Approved

Michelle Rodriguez                    8/16/2012
Assistant United States Attorney        2:16pm
Eastern District of California

Affidavit                                                                              13

# United States District Court

### EASTERN DISTRICT OF CALIFORNIA

**SEARCH WARRANT**
Case No.

## In the Matter of the Search of:

Google, Inc. at 1600 Amphitheatre Parkway, Mountain View, Ca 94043,
of John (Johnny) Gerald Poland, and variations of such; related to
username "dcwbys22", to include dcwbys22@gmail.com; and Google
Voice/Talk accounts connected to telephone number 530 208-3022., and
Microsoft at 1065 LaAvenida, Mountain View, Ca 94043, related to
John (Johnny) Gerald Poland, and variations of such; and username "dcwbys22",
to include dcwbys22@hotmail.com; all as more particularly described in
"Attachment A", attached hereto and fully incorporated herein

*2:12 - SW - - 449   GGH*

TO: _____**FBI Special Agent Christopher Campion**_____ and any Authorized Officer of the United States:
Affidavit(s) having been made before me by ___**FBI Special Agent Christopher Campion**___ who has
reason to believe that **( )** on the person of or **(x )** on the premises/property known as (name, description
and/or location)

Google, Inc. at 1600 Amphitheatre Parkway, Mountain View, Ca 94043, of John (Johnny) Gerald
Poland, and variations of such; related to username "dcwbys22", to include dcwbys22@gmail.com;
and Google Voice/Talk accounts connected to telephone number 530 208-3022., and
Microsoft at 1065 LaAvenida, Mountain View, Ca 94043, related to John (Johnny) Gerald Poland,
and variations of such; and username "dcwbys22", to include  dcwbys22@hotmail.com; all as more
particularly described in "Attachment A", attached hereto and fully incorporated herein

in the Northern District of California and elsewhere there is now concealed a certain person or property,
namely (describe the person or property to be seized)

the records and materials as more particularly described in the Attachment B hereto,
which Attachment B is fully attached hereto and incorporated herein,
*See also Order, attachment C (of)*

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the
person or property so described is now concealed on the person or premises above-described and establish
grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED TO SEARCH, ON OR BEFORE *Aug 30, 2012*
*( communication with providers )*
(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant
and making the search in the daytime - 6:00 A.M. - 10:00 P.M. and if the person or property be found there to seize
same, leaving a copy of this warrant and receipt for the person or property  taken and prepare a written inventory of
the person or property seized and promptly return this warrant as required by law.

SACRAMENTO, CA
_____
City and State

*Aug. 16, 2012  2:55pm*
Date and time issued

GREGORY G. HOLLOWS, U.S. MAGISTRATE JUDGE
_____
Name and title of Judicial Officer

**GREGORY G. HOLLOWS**
Signature of Judicial Officer

**RETURN**

| Date Warrant Received | Date and Time Warrant Executed | Copy of Warrant and Receipt For Items Left With |
|---|---|---|
| | | |

Inventory Made in the Presence of

Inventory of Person or Property Taken Pursuant to the Warrant

**CERTIFICATION**

    I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

    Subscribed, sworn to, and returned before me this date.

_____     _____
U.S. Judge or Magistrate             Date

## ATTACHMENT A

### Locations to be searched

I.     From 6/29/2011 to date of service of this warrant, all accounts at Google, Inc. at 1600 Amphitheatre Parkway, Mountain View, Ca 94043, of John (Johnny) Gerald Poland, and variations of such; related to username "dcwbys22", to include dcwbys22@gmail.com; and Google Voice/Talk accounts connected to telephone number 530 208-3022.

II.    From 6/29/2011 to date of service of this warrant, all accounts at Microsoft at 1065 LaAvenida, Mountain View, Ca 94043, related to John (Johnny) Gerald Poland, and variations of such; and username "dcwbys22", to include  "dcwbys22@hotmail.com".

III.   The Following Means Are To Be Used in Executing The Search:

A.    The officer executing this warrant may affect service by any lawful method, including faxing the warrant with the consent of the above entity;

B.    The custodian of the electronic records described above is to locate the files as described in Attachment B, copy them onto removable electronic storage media and also print them out as paper copies, and deliver both the electronic and paper copies to the officer.  The officer need not be physically on the premises.

ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

You are to provide the following information as printouts and as electronic data files, to the extent available:

1. All stored communications or files, including:  electronic mail of any kind sent to, from and through any email address identified below, whether opened or unopened and retrieved and unretrieved communications; Short Message Service (SMS) "texts", Multimedia Messaging Service (MMS), voice mail, and any other files in electronic storage, left with the provider and other stored files, for the below listed  accounts:

   From 6/29/2011 to date of service of this warrant, all accounts at Google, Inc. at 1600 Amphitheatre Parkway, Mountain View, Ca 94043, of John (Johnny) Gerald Poland, and variations of such; related to username "dcwbys22", to include dcwbys22@gmail.com; and Google Voice/Talk accounts connected to telephone number 530 208-3022.

   From 6/29/2011 to date of service of this warrant, all accounts at Microsoft at 1065 LaAvenida, Mountain View, Ca 94043, related to John (Johnny) Gerald Poland, and variations of such; and username "dcwbys22", to include "dcwbys22@hotmail.com".

    This shall include any "back-up" copies of such data, including all archived records related to or associated with the above referenced names, user names, emails and telephone number accounts.

2. Basic subscriber, session and billing information, to include user connection date and time logs, such as local and long distance telephone connection records, and records of sessions times and durations, including the Internet Protocol (IP) address of the source of the connection, connection information for the other computer to which the user of the above referenced accounts connected, by any means, during the connection period, including IP address, connection date and time, disconnect date and times, method of connection to the destination computer, and all other information related to the connection assigned to the customer or subscriber for each session;

3. Outbound and inbound Call Detail Records;

4. Length of service (including start date) and types of service utilized;

5. Telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address;

6. Means and source of payment for such service (including any credit card or bank account numbers).

For a period of 60 days, the ISP is directed not to close the account or contact or attempt to contact the account holder regarding this warrant or that law enforcement has seized any information relevant to this account or any account holder which may be affiliated with this account and account holder.

Attachment C

The breadth of Attachment B indicates that it seeks information not related to the investigation at issue, e.g., "all text messages." However, the undersigned understands that there is no practical way for employees of the communications provider to distinguish information related to the investigation from those that are not. Therefore, the FBI agent executing this warrant shall only retain in the investigative file those messages related to the investigation described in the affidavit. All other messages shall be segregated and shall not be disseminated to any law enforcement official, includes Department of Justice attorneys, without further order of the court.

Aug. 16, 2012

**GREGORY G. HOLLOWS**